John W. AKINS, Plaintiff,

v.

**OKLAHOMA GAS & ELECTRIC COMPANY, Defendant.**

No. FS-76-51-C.

United States District Court,
W. D. Arkansas,
Fort Smith Division.

July 13, 1977.

Cahill Hitt and Hitt & Pesek, Texarkana, Tex., for plaintiff.

Bryan & Fitzhugh and Bethell, Callaway & Robertson, Fort Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, District Judge.

There is before the court a Motion filed by the defendant on March 9, 1977 for Summary Judgment on the ground "that there is no material issue of fact and that this defendant is entitled to Judgment as a matter of law".

The plaintiff filed no formal response but on his Brief in Opposition to the Motion denies that the defendant is entitled to a Judgment as a matter of law and contends that the record discloses the Motion contains disputed questions of material facts.

The plaintiff, John W. Akins, is a citizen and resident of the State of Texas. Defendant, Oklahoma Gas & Electric Compa-

ny, is a corporation incorporated under the laws of the State of Oklahoma and authorized to do business in Arkansas. The Court has jurisdiction by reason of diversity of citizenship and the amount involved.

The actions complained of and involved herein occurred in Arkansas and the law of Arkansas governs the rights and liabilities of the parties.

On March 25, 1976, the plaintiff, John W. Akins, commenced this action against defendant, Oklahoma Gas & Electric Company, hereinafter referred to as "O. G. & E.", in which he alleged that on or about the 5th day of June, 1974, he was employed by G & M Line Constructors, Inc. to do certain construction work on electrical transmission lines owned and operated by defendant and while working on that date "plaintiff was drilling a hole in a wooden pole when said drill came into contact with a primary line. Plaintiff's body received a strong high voltage electrical shock which proximately caused severe injury and damage to plaintiff." And . . . "that the injury he received was proximately caused by the negligence of defendant, O. G. & E., in failing to *energize* the line upon which he was working." Plaintiff describes the injuries which he claims to have received, and claims to have suffered excruciating pain and mental anguish and will continue to so suffer. He also claims that he lost considerable wages as a proximate result of the injury and will in the future in medical probability have a diminished capacity to earn for the rest of his life, all of which is to his damage in a sum in excess of Ten Thousand and No/100 ($10,000.00) Dollars, exclusive of interest and costs.

Following the filing of the Complaint, the defendant, O. G. & E., on May 4, 1976 filed its Answer and among other things in paragraph six alleged, "at the time plaintiff received his injuries, he was an employee of G & M Line Constructors, Inc., an independent contractor, and was under the direct and exclusive control and supervision of the said G & M Line Constructors, Inc. and the defendant had no control or supervision of him."

Defendant, O. G. & E., moved to make G & M Line Constructors, Inc. a party to the action which Motion was granted. On October 14, 1976, defendant, O. G. & E., dismissed without prejudice its third party complaint against G & M Line Constructors, Inc.

On October 26, 1976, the Sentry Insurance Company, Compensation Carrier of G & M Line Constructors, Inc., filed its Intervention seeking to recover payments made to plaintiff under its insurance policy.

On the same date, the defendant, O. G. & E., then, filed its Amended and Substituted Answer in which it realleged the defenses set forth in its First Answer and in addition thereto pleaded that the Complaint fails to state a claim against it; that the plaintiff was guilty of such negligence as to completely or partially bar recovery; and that plaintiff assumed the risk of his own injuries. As to the Intervention of Sentry Insurance Company, the defendant alleges that the insurance company "is subject to the same objections and defenses that defendant has to the claim of the plaintiff."

Rule 56 F.R.C.P. provides in subsections (a) and (b) that a party to an action may move with or without supporting affidavits for Summary Judgment in his favor upon all claims or any part thereof.

Subsection (c) provides, "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Rule was the first instance of a rule of court or statute which authorized the application of the Summary Judgment procedure in all civil actions and to any and all types of claims and issues that may appear in such actions. *6 Moore's Federal Practice, (Second Edition), Section 56.01, page 56–11.*

The same learned author in Section 56.11, page 56–197, states:

"A summary judgment is a judgment in bar that results from an application of sub-

stantive law to facts that are established beyond reasonable controversy. The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute, and, if not, to render judgment in accordance with the law as applied to the established facts, otherwise to deny the motion for summary judgment and allow the action to proceed to a trial of the disputed facts. The party moving for summary judgment has the burden of establishing that the material facts are not in dispute; and the function of his motion is analogous to the motion for directed verdict."

In Sections 1–2, Pages 56–434 and 435, the author after reviewing the decisions of the Circuit Courts in each Circuit, said:

"The summary procedure remains a very useful one that is applicable to all types of civil cases and issues; and judgment may, of course, be and should be granted in cases that come within the ambit of the above principles. And it is now settled beyond cavil, for all courts, that affidavits, depositions, and other proper materials may cut through pleadings.

"Also, if there is a trend, it probably favors a more realistic use of the summary judgment procedure.

"While trial judges may feel that the appellate courts have unduly limited summary judgment and have often applied the Rule unrealistically, there is considerable evidence that the early and unsound trend in the trial courts has been checked and that district judges now recognize that summary judgments are to be cautiously granted."

Moore also states in Part 2 of his discussion of the subject, Section 8, page 56–638:

"In its broadest scope, the summary judgment procedure is in the nature of a pre-trial inquiry, brought on by Motion of either claimant or defendant party for a favorable determination that a trial is unnecessary because there is no genuine issue as to any material fact."

In discussing Rule 56(c), Professor Moore in *Section 56.09*, page 56–167, states:

" . . . But the real function of summary judgment procedures is to go beyond the pleadings and present matters by affidavits, depositions, admissions, answers to interrogatories or other extraneous material for the purpose of showing that despite issues of fact raised by the pleadings, there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."

Before discussing and analyzing the facts as disclosed by depositions, affidavits, admissions, answers to interrogatories, and other extraneous material, the contentions of the parties should be set forth.

The attorney for plaintiff, on his brief, states:

"It is the plaintiff's position that the Motion for Summary Judgment of O. G. & E. be in all things overruled since plaintiff is not relying on the 'vague hope that something may turn up at trial'. Plaintiff is, in fact, relying on expert opinion of a qualified engineer and that said defendant was negligent and, therefore, fact issue on a specific issue of negligence is raised."

The attorneys for defendant on their brief state:

"The question before the court is simply whether, as alleged in the complaint, there is any evidence of negligence on the part of O. G. & E. sufficient to raise a question of fact for determination by jury."

In *Beckman v. Walter Kidde and Company*, D. C. E. D., New York, 316 F.Supp. 1321, the court at page 1324 said:

"The purpose of a summary judgment is to screen out sham issues and "to discover whether one side has no real support for its version of the facts," (*Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962), and "summary judgment cannot be defeated by the vague hope that something may turn up at trial."

On page 1325, the court said:

"A party cannot raise an issue of fact simply by relying upon the complaint or an affidavit setting forth only a bald conclu-

sion that is flatly denied." Affirmed, *Beckman v. Walter Kidde and Company*, 2nd Cir., 451 F.2d 593.

It is undisputed that plaintiff was an employee of G & M Line Constructors, Inc. which had entered into a contract with O. G. & E. to do certain work on its distribution lines. The contract is dated September 9, 1970 and designates O. G. & E. as "company" and G & M Line Constructors, Inc. as "contractor".

Article VII of the contract provides:

"It is specifically understood and agreed that contractor is and at all times shall be considered to be an independent contractor, and that no part of the force or outfit employed in the performance of the work under the terms of this contract shall be considered or construed to be employees of the company, but an authorized company inspector, or his assistants shall at all times have access to the work. In the event the inspector, or any of his assistants finds or observes any defective work or work being done in violation of the plans and company construction standards furnished to the contractor, the inspector shall notify contractor who shall make necessary corrections . . . ."

Article VIII of the contract reads as follows:

"Contractor assumes full responsibility for and agrees to indemnify company against any and all claims, demands, suits and judgments based on injuries to and death of persons, including officers, agents and employees of contractor and company, or any injury or damage to the property of the company or other persons which may arise out of the performance of this contract as a result of any wrongful or negligent act or omission of contractor or its employees."

In Article IX, the contractor agreed to comply with the workman's compensation laws of the State of Oklahoma and the State of Arkansas and all state and federal laws relating to labor and to keep the property free from all liens, claims or judgments of any and every kind or nature arising from or growing out of the work. Contractor shall also defend and indemnify company and hold harmless from and against any and all suits, actions or proceedings.

■ The characteristic incident of the relation created by an independent contractor is that the employer of the contractor does not possess the power of controlling the person employed by the contractor as to details of the stipulated work and, therefore, the employer, O. G. & E., is not answerable for an injury resulting from a manner in which the details of the work are carried out by the independent contractor. *41 American Jurisprudence 2d, Sec. 24, page 774.*

In *Meyer v. Moore*, 195 Ark. 1114, 115 S.W.2d 1087, the Court had under consideration a case where an employee of an alleged independent contractor, was injured. At page 1117 of 195 Ark., at page 1089 of 115 S.W.2d, the Court said:

"The question for this court to determine is whether appellee was an independent contractor in such sense that it was the duty of the trial court to direct a verdict for appellant, or whether on the other hand the evidence made it a jury question as to whether appellee was an independent contractor, or, if he was an independent contractor, whether appellant interfered and assumed to direct the work in such manner as would make him liable for appellee's injuries."

In discussing the question, the court held that the retention by the employer of the right to supervise as to construction as distinguished from the rights to supervise as to the means by which the results should be obtained, does not affect the relationship between the parties.

■ It is only when the employer goes beyond the limit of his contract and commits some affirmative act of negligence, as by some part in the performance of the work other than such general supervision as is necessary to insure its performance, that he is liable.

■ There can be no doubt but that the defendant, O. G. & E., used ordinary care in

selecting a contractor of proper skill and competence to perform the work called for by the contract. The fact that an employee of the independent contractor was injured raises no presumption that the owner was negligent in employing the contractor. In fact, the plaintiff was an experienced lineman. He had worked for G & M Line Constructors, Inc. in the summer of 1972 and again beginning in the winter of 1973 until the date of his injury on June 8, 1974.

In *Western Arkansas Telephone Company v. Cotton*, 259 Ark. 216, 532 S.W.2d 424 (1976), the appellee, Cotton, an employee of Darrell Hutcherson, d/b/a Hutcherson's Tree Service, was injured in Waldron, Arkansas on July 28, 1970 while taking down some outdated telephone cables. He filed the suit to recover on the ground that appellant, Western Arkansas Telephone Company, was negligent in selecting Darrell Hutcherson as the contractor to remove the telephone cables.

The Court, at page 219 of 259 Ark., at page 426 of 532 S.W.2d said:

"Thus, since the uncontradicted evidence shows that Hutcherson employed a competent and experienced foreman and that he had successfully completed other work for the appellant in a satisfactory manner and without incident, we hold that there was no substantial evidence to warrant the submission of this case to the jury on the theory that appellant was negligent in selecting Hutcherson as its contractor."

The Court further stated:

"We note that there is a conflict among the authorities whether an employee of an independent contractor can maintain an action against his employer's principal, see *41 Am.Jur.2d Independent Contractors 26 (1968)* and Annot., *44 ALR 932, 976 (1924),* but since that issue was not raised in the trial court, we have left that issue for future determination."

Plaintiff does not contend that O. G. & E. interfered in any manner as to the control of G & M Line Constructors, Inc., or that O. G. & E. directed the manner in which the work should be done. Thus, there is no contention that O. G. & E. was negligent in selecting G & M Line Constructors, Inc. to do the work as outlined in the contract.

The only allegation contained in the complaint relative to negligence has heretofore been stated, but for absolute accuracy, the court is quoting paragraph 3 of the original complaint: "Plaintiff would allege that the injury he received was proximately caused by the negligence of defendant, O. G. & E., in failing to energize the line upon which he was working." (It is apparent that plaintiff meant to say "deenergize" rather than "energize". No amendment was offered by any one.)

In paragraph 4, plaintiff alleges: "As a direct and proximate result of the negligence of defendant, O. G. & E., plaintiff has sustained the following damages." (Then follows allegations as to the injuries and the extent thereof.)

A lengthy discovery deposition of the plaintiff, John W. Akins, was taken on February 4, 1977 in which he testified:

That he is 36 years old and had worked for G & M Line Constructors, Inc. in the summer of 1972 and again beginning in the winter of 1973 until the date of his injury on June 8, 1974. The contract of his employer called for removal of old O. G. & E. distribution line poles and replacement with taller transmission line poles. The transmission line is an electric line which goes from substation to substation. A distribution line goes from substation to customers of the utility. Ordinarily distribution lines are installed on shorter poles closer to the ground than are transmission lines. Distribution lines were already installed along the route involved herein. The G & M crew were installing new transmission lines along the same route necessitating use of taller poles. To accomplish this the employees of G & M attached extensions at both ends of the horizontal cross arms on which the existing distribution lines were strung so that the distribution lines could be "spread" or removed out away from the distribution line pole. (In this instance, the "spreader" was not used). Then a taller transmission line pole could be installed at a point be-

tween two of the old distribution line poles while those distribution lines were spread to permit installation. It was contemplated that the cross arms for the existing distribution lines would be affixed to the taller transmission line poles and the old distribution line poles would be removed and taken away. The transmission lines would, of course, be affixed to the taller poles but at a higher level than the distribution lines. Distribution lines provide electricity to customers of the utility and the electricity is not cut off or stopped while work is being done on the distribution lines. To avoid interruption of service to customers, all distribution line work is done while those lines are "hot" and, of course, G & M did not request that O. G. & E. cut off the electricity. The plaintiff's injury was caused by contact with one of the live distribution lines. Plaintiff was aware that these were live wires and knew that they never "turn off" the electricity, on the distribution lines. The transmission lines had not been installed at the time of the accident, but the distribution lines which were already in place had to be transferred from their shorter poles to the taller transmission line poles which were being installed along the route. Prior to commencing any work, plaintiff had wrapped the live distribution lines with a protective rubber live hose, which he called a "gut". These went completely around and encompassed the distribution line. At the time of the occurrence, plaintiff was standing in one of the two buckets in a "cherry picker", a piece of equipment which is operated from the ground and which is used to elevate workers to the desired height to do work on the utility pole. Plaintiff had a drill with him and was drilling one of the two holes in the transmission line pole which would subsequently be used to bolt a cross bar to the pole for use in supporting the live distribution lines. Lines were not attached to the pole at the time of the occurrence, as a transmission line pole had been raised between two shorter distribution line poles and the distribution lines were still being supported by the older shorter poles. In some manner the plaintiff was unable to explain, his drill came into contact with one of the live distribution lines causing an arch and resulting in instant electrical burns which are the subject of his claim for damages. He further testified in his deposition that he did not know whether O. G. & E. did wrong that may have contributed to his injury or the severity thereof; that he did not know whether O. G. & E. equipment contributed anything wrong nor did he have any knowledge of any deficiency in any of the equipment.

Q: "Do you have any knowledge of any deficiency or failure on the part of any one employee of O. G. & E. that you feel contributed to your injury or the severity of your injury?"

A: "I don't know".

Q: "You don't know of anything that any of the O. G. & E. employees did or failed to do which you think was responsible or contributed to your injury. Is that correct?"

A: "Yes, sir."

Q: "And you can't identify anything wrong with any of the O. G. & E. equipment or the distribution lines or any of this?"

A: "No, sir."

Q: "Therefore, you cannot give me any specific criticism of O. G. & E. as to anything that you feel it did or failed to do which was responsible for your injury or the severity of this injury?"

A: "No."

The plaintiff made no filings after the complaint was filed until on March 28, 1977 he moved for a postponement of the hearing on defendant's Motion for Summary Judgment for at least thirty (30) days and on June 3, 1977 propounded certain interrogatories to the defendant which were answered by defendant on June 6, 1977. There is also in the record dated February 4, 1977 a response by plaintiff to a request for admissions served on February 4, 1977, in which the plaintiff stated that he "would respectfully deny":

"At the time of the injuries complained of, plaintiff was working as an employee of G & M Line Constructors, Inc., pursuant to

a contract for such work between O. G. & E. and G & M Line Constructors, Inc., whose legal relationship with defendant, O. G. & E., in performing such work was that of independent contractor."

At the time defendant filed its Motion for Summary Judgment, it filed on May 24, 1977, the affidavits of George W. Long, Division Engineer, and Ray Girard, Division Substation Supervisor in Fort Smith, Arkansas, which position he had held since July of 1971. He was in charge of the Massard substation at the time plaintiff came into contact with an O. G. & E. electric wire. Also on same date, the defendant filed the affidavit of Charles A. Uerling, a registered professional engineer, who had inspected the O. G. & E. Massard Substation and consulted with other engineers relative thereto. On June 28, 1977, a Supplemental Affidavit of Mr. Uerling was filed. On May 16, 1977, plaintiff filed his brief in opposition to the Motion for Summary Judgment and attached thereto an affidavit of Jon D. Scarborough, a registered engineer of 1805 Peyco, Arlington, Texas. On July 5, 1977, Mr. Scarborough also filed a Supplemental Affidavit. On June 6, 1977, three days after they were filed, the defendant filed its answers to interrogatories propounded by plaintiff to which was attached exhibits in support of the Answers.

On June 9, 1977, the plaintiff filed a deposition of Rex Butler taken on June 9, 1977.

The record attached to O. G. & E.'s answers to the interrogatories on June 6, 1977 is the log for the Massard substation circuit breaker. A critical examination of the log gives all information relative to the action of the "breaker". In other words, the plaintiff seems to be complaining that the current entered his body for a longer time than it would have entered had the breaker operated on June 8, 1977. As a matter of fact, a careful reading of all of the affidavits shows that the breaker was not actuated when the contact with the line was made by the plaintiff.

The answer of defendant to the interrogatories propounded by plaintiff is a complete answer to the charge of negligence made by plaintiff against defendant. If plaintiff had carefully wrapped the distribution lines, or if he had used the "spreader", or if he had used ordinary care to not contact a distribution line, which were then in the position where he had placed them, the accident would not have happened. He had a mechanical drill and was either removing the drill from the hole in the pole which he claims he drilled before he evidently touched a bare portion of the distribution line which he had failed to wrap.

The burden is upon the plaintiff to prove the negligence on the part of the defendant. This burden has not been met and plaintiff's engineer, Mr. Scarborough, in his affidavits, states that the Roller-Smith 100–0C–11 Breaker Serial # 42030A should have locked out on June 8, 1974, the date of the accident. But he also states that if the breaker tripped during the accident, a proper setting "manual position would have substantially reduced the time to which Mr. Akin was subjected to the electrical fault."

The plaintiff's engineers, by their affidavits seem to concede that O. G. & E. was not in any way responsible for damages sustained by plaintiff as the result of his initial contact with the live distribution line. Instead, plaintiff appears to be advancing a novel second injury theory in which he seeks to cast blame upon O. G. & E. for damage sustained when current returned to the lines after being temporarily interrupted by the tripping of the circuit breaker. (By analogy, when a fuse blows in a private home, the electricity stops and stays shut off until the fuse is replaced. Plaintiff contends that the circuit breaker serving the lines on which he was working should have been set to function in the same manner rather than in its normal setting whereby current is cut off temporarily and is then restored automatically and is shut down completely only if the fault continues to be present).

Likewise, the engineers were unaware that when plaintiff came into contact with the live distribution line, the resulting fault burned itself out before attaining the 480

amps necessary to trip the circuit breaker. Thus, the identical injury would have occurred if the circuit breaker had been set in the manual code. The plaintiff was not injured during any restoration of current to the lines permitted by the circuit breaker's automatic setting since the circuit breaker never tripped on the date of the injury.

The plaintiff concedes that he cannot hold O. G. & E. responsible for any injury other than that sustained as the result of the current being restored by the automatic setting of the circuit breaker after having been shut off.

The speculative nature of plaintiff's case is even more apparent when one looks beyond the liability issue to the question of damage. The plaintiff's theory advocated by the engineers would hold O. G. & E. responsible only for injury caused during a reclosure of the circuit breaker (restoration of current after tripping of the circuit breaker). Since catastrophic injury would result from the initial contact with the electric line which plaintiff concedes would not be the responsibility of O. G. & E., it is difficult to know just how plaintiff would prove how much damage he sustained as the result of a second shock even if the circuit breaker had tripped and then reclosed. It is not necessary, however, to deal with these problems, since the undisputed fact is that the circuit breaker never tripped and, therefore, plaintiff could not possibly have sustained any injury during a reclosure. Just how engineers of plaintiff can justify their apparent claim that the injury occurred after the first contact with the live line and that the circuit breaker should have been set so as to prevent current from being restored to the lines after a contact of sufficient magnitude to produce catastrophic injury or death is not and cannot be explained.

A mere reading of the Affidavits of Mr. Scarborough and a comparison with the Affidavits and information from its records submitted by defendant, discloses without a doubt the fatal weakness of the plaintiff's theory of liability and also discloses the strength of the defendant's contentions in support of the Motion for Summary Judgment.

The Court has considered all of the documents, affidavits, depositions, and other material submitted by both plaintiff and defendant, and after thorough consideration is of the opinion that there is no genuine issue as to any material fact and that the defendant is entitled to a Judgment as a matter of law.

A Judgment in favor of defendant dismissing plaintiff's complaint is being entered today.